**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                     CRIMINAL CASE NO. 06-20207
                                       HON. MARIANNE O. BATTANI

JON RUTHERFORD and JUDITH BUGAISKI,

        Defendants.

_____/

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Before the Court is defendants Jon Rutherford and Judith Bugaiski's Motion to Suppress Evidence and Dismiss Indictment (Doc. #14). They are charged with multiple counts of Income Tax Invasion in violation of 26 U.S.C. § 7201, Wilful Failure to Pay Over Tax in violation of 26 U.S.C. § 7202, Fraud and False Statements to the Internal Revenue Service in violation of 26 U.S.C. § 7206, and Conspiracy in violation of 18 U.S.C. § 371. The initial issue the Court must determine is when there were firm indicators of fraud that should have terminated the civil investigation being conducted by the IRS. Towards that end, the Court conducted an evidentiary hearing on January 11, 12, and 25, 2007. The parties submitted their proposed findings of fact on this initial question on March 30th.

After reviewing the hearing testimony and the proposed findings, the Court finds that there were firm indications of fraud immediately preceding the defendants' second interview on June 17, 2004.

## II.     FINDINGS OF FACT

On August 29, 2001, an unfavorable article about Metro Emergency Services ("MES") appeared in the Detroit Free Press.  Hr'g Tr. Vol. I, at 53-54.  There was a substantial amount of information in the article, including the suggestion that a large amount of money and big political figures were involved.  Id., at 142.  There was also the potential for notoriety.  Hr'g Tr. Vol. I, at 143.  In May, 2003, revenue agent Wesley Tagami of the IRS was assigned to look into the financial affairs of MES, a non profit organization.[1]  Id., at 14-15.  The time lag of 21-22 months between the appearance of the unfavorable article and the beginning of the MES investigation was attributed to "bureaucratic delay."  Id., at 55.  Jon Rutherford was the president of MES  which operated a homeless shelter for women in Highland Park Michigan.  Gov't Ex. 6, 7.  Tagami was assigned to the Tax Exempt and Government Entities Division of the IRS and was therefore responsible for examining the records of tax exempt organizations, such as MES, to determine whether those organizations were fulfilling the purposes for which they received tax exempt status, whether they were filing all the required forms with the IRS, whether the officers were overcompensated, etc.  Hr'g Tr. Vol. I, at  8, 12, 13.

Reviewing the IRS records, Tagami became aware that MES had not filed several 941 forms which deal with the withholding tax of employees.  Hr'g Tr. Vol. I, at 17.  Because issues related to withholding taxes were beyond his area of expertise, Tagami contacted Gregory Mahaffey, a revenue officer, whose responsibilities included the collection of unpaid taxes.  Id.

---

[1] These non-profit organizations are frequently referred to 501(c)(3) entities, which is the code designation for institutions and companies that are exempt from paying federal income tax because of the nature of their activity, e.g. charitable.  Hr'g Tr. Vol. I, at 9.

After his review of the records, Mahaffey sent a memo, dated July 31, 2003, to Tagami, in which

he stated, in part:

> 2.  This case is filled with very large and significant indicators of fraud. . . . .
> Based on the vast numbers of unfilled payroll tax returns, and the size of
> the payroll (according to the news article they have several locations), the
> total balances due could be staggering.
>
> 3.  Despite my initial excitement when reviewing the case, this case will need
> some development before submitting to CI [criminal investigations]
> (providing the indicators hold up after all facts are discovered). There may
> be plausible explanations to all the discrepancies here. The initial review
> shows over a half million dollars owed in back payroll taxes since 1996
> and a huge number of unfiled payroll tax returns for years from 1994
> through 2003. In addition, the main officer, Jon Rutherford, is taking AT
> LEAST $275,000.00 to $400,000.00 per year from these entities. He
> shows significant income tax withheld which has not been supported by
> filed and paid 941 returns.
>
> . . . .
>
> 7.  To conclude, the first thing from a collection standpoint is to get
> the $533,000.00 currently owed PLUS all delinquent 941 returns.
> We need to see just how many entities are actually operating here
> and what the final tally will be for any potential liabilities due. I
> am available for assistance from a collection standpoint. As far as
> the fraud indicators, it is my understanding that you have an
> appointment with FRS Mel Frommer this Thursday 8-7[2003]. He
> will be the best expert to assist you on those issues.

Gov't Ex. 1.

Mahaffey explained that, after he looked at the records, he saw "potential fraud."  Hr'g

Tr. Vol. I, at 207.  If "firm indicators of fraud" are present, the IRS Manual requires that the case

be referred to the Criminal Investigations Division ("CID").  Id., at 59.  He went on to explain

that the problems he detected from his examination of the records could have had many different

explanations, "which would negate the possibility that a true fraud case could be developed."

Id., at 208-209.

On August 1, 2003 Tagami, after talking with Mahaffey, concluded at that time that there was no indication that Rutherford had not reported all of his income. Hr'g Tr. Vol. I, at 21-22.

Merrill Frommer was consulted on the case in July 2003 because he was a Fraud Referral Specialist. Hr'g Tr. Vol. I, at 86-88, 93. As a Fraud Referral Specialist, Frommer has the responsibility of initially determining whether a case has first indicators of fraud. If Frommer determines that a case does have first indicators of fraud, the status of a case is updated to "Status 17," which is a "fraud development" case. Id., at 87. In that event, Frommer "assist[s] the agent in further development in order to determine whether he does have fraud or whether he doesn't have fraud based on the acts of the taxpayer." Id., at 88. Frommer puts together an "individual development plan or action plan" for the agent[s]. Id., at 88. Tax fraud could be either civil or criminal, depending on the intent of the taxpayer. Id., at 88-90.[2] Indicators of fraud include: (a) excess compensation; (b) unfiled 941 returns; (c) multiple tax ID numbers; (d) unpaid payroll taxes; and (e) excess rent. Id., at 145-47. He has the responsibility, at the field level, of making a determination whether a referral to the criminal division is required. Id., at 113-14.

Tagami met with Mike Bagley (his supervisor), Frommer and Roscoe Burns, (another fraud referral specialist), on August 7, 2003. Hr'g Tr. Vol. I, at 22. At that meeting, Frommer gathered information in order to determine whether there were first indicators of fraud and he proposed an action plan. Id., at 93-4. He knew that this was a matter where he wanted "some resources," including a revenue officer and an agent. Id., at 139. Consequently, it was decided

---

[2] If there is a final determination that the taxpayer had engaged in civil fraud, a substantial monetary penalty results. Hr'g Tr. Vol. I, at 88.

that Suzanne Carene, a revenue agent from a small pool of Special Enforcement Program (SEP) Agents, would have the responsibility to examine the individual tax returns. A SEP agent is a financial investigative specialist with general tax law knowledge and auditing skills. In the view of the IRS, these agents are "experts in the identification and development of cases with fraud potential." Id., at 140-41.[3] Revenue Officer Toni Allen would be responsible for collection of unpaid taxes, and Revenue Agent Tagami would be looking at possible excessive compensation of officers. Id., at 94-5. The fact that FRS Frommer was actually given such a staff was a rare occurrence. Id., at 143.

In addition to the issues regarding withholding taxes, Frommer was made aware that Rutherford's returns included taxes withheld, even though the money had not been remitted to the I.R.S. Although this was a first indicator of fraud, Frommer realized that there could be innocent explanations for the claim on the returns, such as Rutherford's lack of knowledge about the non-filings of 941s or the fact that the funds had not been remitted to the IRS. Hr'g Tr. Vol. I, at 97. Because of those and other unanswered questions, an interview of the taxpayer was critical to find out what he personally knew. Id., at 98.

After being apprised of the facts known to the IRS as related to him at the August 7, meeting, Frommer concluded that, at that time, there were first indicators of fraud. He "thought we had some first indicators of fraud, that they needed to be developed in order to make a conclusion whether we did or didn't." Hr'g Tr. Vol. I, at 99. Frommer also explained that, as cases such as this develop, only rarely do they result in a referral to the Criminal Investigative

_____

[3] The SEP agents were known in the past as the Organized Crime Unit, but they have always done the same type of work. Hr'g Tr. Vol. II, at 152.

Division. Id., at 100. He summarized the result of the August 7th meeting in a memo to Tagami,

dated August 19, 2003, which states, in part:

> Based on our meeting and subsequent phone conversations, I have summarized the action plans we discussed as well as the coordination between SB/SE Compliance and Collection functions.
>
> Before we jump to any conclusions, I suggest you first get the POA/TP [power of attorney/taxpayer] to outline the reason and use of the various EIN's. Once this is done, go back to the transcripts and attempt to reconcile to what the POA/TP has told you to what was actually filed and paid. . . . . Once you have a general understand or miss-understanding of what they were attempting to do and actually did, I would do the following:
> . . . .
>> • Once you feel you have an understanding of who was suppose to be responsible for withholding, depositing and filings the employment taxes, Go back and Interview the President, Vice President and Controller (separately). Remember, your objective is to determine who is the responsible party. *If one points the finger at the other, use this during your interviews to drive a wedge between them. Re-interview each party as necessary.*
> . . . .
> Securing Returns
> The individual tax returns for Mr. Rutherford have been requested and will be assigned to the SEP group. . . . . .
>
> Request, from the POA/taxpayer all unfilled F941's with full payment. Reconcile 941's with W-2's & W-3. Determine if any 1099's were issued (or should have been issued) in an attempt to reduce the employment tax burden.
> . . . .
>
> **Related Examinations:** I understand that you have the Mayor's civic organization under examination and that they have fail/refused to respond to your request for an appointment. I also understand that there were several questionable related transactions between the two entities. I would like to see these two examinations conducted as a parallel investigations in order to more completely understand the relationships between the parties.
>
> **Form 11661**: Based on our conversations and review of your case file, I believe that there are some first indications of Fraud. As such Fl1661 need to be completed, signed by your manager and forwarded to me for Status 17 approval.

Gov't Ex. 2.

On October 16, 2003, another meeting was held so that Frommer could be updated on the progress of his action plan. Hr'g Tr. Vol. I, at 105. The issues covered at that meeting included excess benefits that went to Jon Rutherford, withholding tax, transfer of assets, an apparent discrepancy between the original 990 form (the return filed by MES) and the amended return, as well as the returns filed by the officers regarding their compensation. Id., at 106-107. As a result of that meeting, Frommer proposed further action, which included obtaining unfiled 941 forms (the form used to document taxes withheld), 1040 forms (personal tax return forms), and prior 990 forms (annual form to be filed by non-profit organizations); filing liens, identifying properties; contacting third parties; determining ownership of buildings, transfer of ownership and lease of the MES building; and, requesting an extension of the statute of limitations for assessment of taxes. Id., at 108-112.

Revenue Agent Suzanne Carene was present at this meeting during which the need to interview one or more of the taxpayers was discussed. Hr'g Tr. Vol. II, at 6-7. She explained the importance of interviews of the taxpayers to enable them to provide explanations about the indicators of fraud that had been detected by the IRS examiners:

> [I]n our Internal Revenue Manual it states that to develop our cases, interviewing the taxpayer is critical because we like to make sure that the taxpayer has the opportunity to explain any discrepancies or explain any problems that we might find with issues, and a lot of times once we get their explanation then we just drop that issue and go onto something else if it's determined to be just a simple kind of issue.

Id., at 7-8. Frommer, testifying about that meeting, also stated that the most important next step in the examination process was the interview of the taxpayer. Hr'g Tr. Vol. I, at 108.[4]

---

[4] In his testimony about that meeting, Frommer was asked, "Q. Okay. Now, using this date, as of what you knew and the result of this meeting, at that time did you believe, based on

On November 18, 2003, Officer Allen received a call from Agent Carene who advised her that she [Carene] had met with district counsel. Allen was told by Carene that "district counsel does not want us soliciting returns from the taxpayer" and that "this case will probably ultimately end as a fraud referral." Hr'g Tr. Vol. III, at 23-24. At all times relevant to this investigation, FRS Frommer and Burns and Agent Carene were well aware of the Tweel case (United States v Tweel), involving the issue pending before this Court. Hr'g Tr. Vol. I, at 163, 185, Hr'g Tr. Vol. II, at 68, 81.

On November 19, 2003, Agent Carene placed a phone call to Revenue Agent Frank Belcher, who was examining the Kwame Kilpatrick Civic Fund, and offered her assistance regarding "any fraudulent type of activity." Hr'g Tr. Vol. II, at 95-96. She had information regarding a check from the Fund going to MES and other suspicous activity involving the Mayor's father.

Bernard Gibbons was the representative of the taxpayers (MES, Rutherford, and Bugaiski).[5] Carene was informed by Tagami that Gibbons had not provided all the documents

---

what had been done by the various officers and agents, that there were firm indicators of fraud?" Hr'g Tr. Vol. I, at 113. Frommer responded in the affirmative. When put in context, it is clear that Frommer had either misunderstood the question or had made a misstatement. The terms "first indicators of fraud" and "firm indicators of fraud" are part of the IRS vernacular and have a quantitative difference which require different responses. Hr'g Tr. Vol. I, at 87; IRM 25.1.3.2. Because they sound similar, it is possible that Frommer understood "firm" to be "first." Frommer's subsequent actions and directives demonstrate that his response to that one specific question was inaccurate. He proceeded with meetings and action plans (See e.g. Gov't Ex. 3) during the ensuing months, which manifest his opinion that further development of the case was necessary before there could be a criminal referral or a decision that there was insufficient evidence for a referral.

[5] Rutherford chose Gibbons, a CPA, to be his representative in dealing with the IRS and executed a form that gave Gibbons power of attorney. Hr'g Tr. Vol. II, at 41. Because Gibbons was authorized to represent the taxpayers, he is frequently referred to as the "POA" in the IRS

that he had requested.  Carene met with Gibbons on December 3, 2003, at which time he provided some of the documents.  Asked about Rutherford at that meeting, Gibbons was unable to provide much information.  Gibbons stated that Rutherford was not willing to meet with IRS personnel.  Carene responded by informing Gibbons that the process would be expedited and would be more efficient for the government and the taxpayer if she could meet with Rutherford personally.  Another meeting was scheduled for December 16.  Hr'g Tr. Vol. II, at 9-12.

Jon Rutherford and Judith Bugaiski came with Gibbons to the Dec. 16 meeting.  This was the first time that Carene had met with either of them.  Hr'g Tr. Vol. II, at 12-13.  Bugaiski produced some records at that time.  Id., at 13-14.  Agent Carene brought some documents with her which included tax returns for members of DPR, the DPR general ledger, and photocopies of checks and Form 1099s.  Id.  DPR was a limited liability company and should have filed a 1065 partnership return.  Agent Carene felt that requirement had been violated.  Hr'g Tr. Vol. III, at 14-15.  Carene asked about the unfiled 941 forms and the unpaid withholding taxes.  She was told by Rutherford and Bugaiski that they had contacted Angelo Fracassa of the IRS for assistance in dealing with this issue.  Rutherford stated that it was never their intent not to file the 941 forms.  Id., at 15-16.

Carene questioned Rutherford about the fact that he had taken a withholding credit on his tax return.  Bugaiski and Rutherford responded that it was not their intent not to pay the IRS the money that had been withheld from their paychecks, but that they had gotten behind because funds owed to them came in late.  Hr'g Tr. Vol. III, at 15-17.  The interview ended when

---

memos.  Hr'g Tr. Vol. II, at 8-9.

Rutherford pounded his fist on the table and said that he wanted to leave. Carene informed them that she was not finished and that she needed more information. Id., at 18.

As part of her SEP training, Agent Carene went to an IRS training facility in Florida where topics included interviewing, net worth analysis, indirect methods of proof, and offshore training (assets outside the United States), which could include people hiding money. The IRS Manual regarding the duties of SEP agents like Agent Carene provides:

> An in-depth interview is one of the most important aspects of a SEP examination. Interviews are used to obtain leads, develop information, and establish evidence. The testimony of witnesses and the admissions of alleged violators are major factors in resolving tax cases.

Internal Revenue Manual, §4.16.1.3.2 (1).

On January 21, 2004, at a lengthy meeting involving FRS Frommer and Burns, district counsel Nicholaides, Officers Tagami and Allen, Agent Carene, Group Manager Carl Gusse, and a territory manager, there was a discussion about the ramifications of a fraud referral at that point in time but, according to Officer Allen, "everyone says its too early in the game." Hr'g Tr. Vol. III, at 29-31. Officer Allen thought that this meant there was more information that could be gathered from the taxpayers, third parties, etc. before the case was referred to the Criminal Investigation Division (CID). There were different kinds of tax violations and, therefore, different sections of the IRS working on the case. Id., at 31-32. Officer Allen believed that a criminal attorney for the district was also in attendance at this meeting. Id., at 30-31. After the meeting, Frommer prepared a memo which summarized the next steps to be taken in the development of the case. In that memo he listed a number of actions to be taken.

In his first point he stated, "[w]e will not split the trust fund issues from the other issues for the purposes of making a criminal referral at this time."  Gov't Ex. 3.  Frommer explained this part of the action plan:

> Q. Okay, and you used the phrase, "for the purposes of making a criminal referral at this time." What did you mean by that?
>
> A. Well, we were looking at, you know, some, we had some first indicators of fraud. We were in the process of determining if we had firm indicators of fraud, and if we wound up having firm indicators of fraud, I wanted it to be a combined referral rather than having, you know, the RO making a criminal referral, Wes Tagami making a criminal referral and Sue Carene making a separate criminal referral based on her own acts of fraud. I wanted to have just one referral to CI [criminal investigation].
>
> Q. Did you know at this point whether or not there would be a criminal referral?
>
> A. No.
>
> Q. Why not?
>
> A. We just hadn't fully developed all the information that we were still in the process of obtaining.

Hr'g Tr. Vol. I, at 115-116.

His next points were based on a concern that the recipients of the donations were actually tax exempt organizations.

> • *Sue Carene will focus on the DPR[6] examination and will trace the flow of the charitable contribution deductions and depreciation basis issues.  Please ensure that these entities are listed 501(c)(3) organizations.*

Id., at 114.

---

[6] DPR was Rutherford's management company which had purchased the building in which MES was performing its services.  DPR bought the building from MES and subsequently received lease payments from MES.

The next action point in his memo dealt with solicitation of returns: "*There will not be any additional solicitations of any unfilled tax returns by either Toni,[Allen] Wesley [Tagami] or Sue [Carene].*"

Frommer explained that, at this point in the examination, it would be easier for IRS to determine the tax due and owing, rather than continuing to ask the taxpayer to start filing returns and figuring out the taxes. Id., at 116.

He next addressed the need for a trust fund interview:[7] "*Toni will conduct the "Trust Fund" penalty Interview with Jon Rutherford & Judith Bugalski (Sue will accompany her in the event that additional issues arise.)*"

Frommer then pointed out the need to protect the government financial interests. "*Toni & Roscoe will determine if any additional levies or liens will be filed. It was my understanding that we would levy the county contract payments.*" Id., at 118. Suspecting that Rutherford may have owned properties that could be attached to protect its interest, Frommer directed that: "*Sue & Wesley will determine who owns the 91 group homes and follow-up if there are related Issues with the ownership and filing requirements or any related issues.*" Id., at 118-119.

Regarding the issue of Rutherford's intent as it pertained to the nonpayment of withholding taxes, Frommer pointed out: "*Sue will attempt to locate the former controller (D. Morgan) for an interview to determine her knowledge and assess Jon Rutherford's knowledge of the unfiled & unpaid 941s.*" Id., at 120.

---

[7] When a company fails to remit taxes withheld from its employees, the IRS determines which person(s) are responsible for that liability. There is also a penalty assessed. This is a civil remedy. Id., at 117-118.

The next point dealt with the procedures for collection of taxes when a taxpayer does not file a return. "*As a result of the original solicitations of returns, SFR 6020(b) procedures should proceed. (Toni, please confer with Roscoe [Burns]on this).*" Id. In an attempt to determine whether or not DPR was dealing at arms length with MES, Frommer directed Tagami to do a couple of things:

> • *Wesley will make a referral to engineering to determine the FMV rent MES is paying to DPR as well as make his own inquires.*
>
> • *Wesley will follow up on the actual transfer cost DPR paid to MES for the building.*

Id., at 121-122.

Frommer also needed more information about the allegation of excessive compensation: "*Wesley will also continue to address the excessive compensation issues of MES.*" Id.

Because there was information that the father of the mayor was on the payroll, Frommer wanted to make sure that this properly accounted for. Id., at 122. He therefore directed: "*Wes needed to follow up on 1099 payments to Mayor's civic organization and to Mayor's father.*" Id.

Roscoe Burns, a Fraud Referral Specialist whose responsibility focused on the collection of unpaid taxes, also attended the January meeting. Hr'g Tr. Vol. I, at 178-180.[8] Burns also drafted a memo that dealt with the meeting. Gov't Ex. 4. That memo stated, in part:

> Based on the blatant non-compliance and the suspicious business activities of the taxpayer Revenue Officer Allen believes that first indications of fraud exist. Due to the taxpayer's continued refusal to comply with the employment tax laws and the questionable personal and corporate accounting practices it appears that Revenue Officer Allen is correct in her assessment that first indications of fraud exist.

---

[8] Burns also attended the August 7, 2003 meeting.

13

Actions were discussed and recommended to determine if firm indications of fraud can be established. Those actions are listed on the attached form 11660. This case has been discussed with the group manager and he concurs that first indications of fraud exist. Sub-Code 910 was input to reflect fraud development.

Attached to Burns' memo, on Form 11660, was a list of actions that the IRS "needed to determine, not only whether [they] could establish firm indications of fraud but also what issues [they] need to address in the continued civil aspects of the case." Hr'g Tr. Vol. I, at 183. Burns explained, "Until we determine that we did have firm indications of fraud established, we are to proceed with the case doing the normal activities that revenue officers were to do with a case of this nature." Id.

On the same day, Agent Carene, district counsel, and Group Manager Smolinski had a meeting or discussion with the Special Agent in Charge (SAC) of the entire Criminal Investigation Division (CID) concerning whether the use of a Form 6020(b) would compromise the criminal referral. Hr'g Tr. Vol. II, at 20-21. Form 6020(b) is a substitute for a tax return and is filed by IRS. Id., at 72. A series of e-mails referencing this issue were sent the next day. In one of those e-mails, Agent Carene wrote: "Stan [Smolinski] would likely speak to the SAC again. Id., at 20-21, 102-104.

The day following the meeting, Carene sent an e-mail to Alexandra Nicholaides, an IRS attorney who attended the meeting. Hr'g Tr. Vol. II, at 20-22. It dealt with questions posed to the SAC after the meeting.[9] Carene explained that, after the meeting ended, someone saw the

_____

[9] In that message, Carene stated, "Good morning. Stan said he, Stan said he came out of the meeting with the SAC [Special Agent in Charge, Criminal Investigative Division] scratching his head about the 6020(b) situation. Should it be done, shouldn't it be done and if it compromises a referral. I came out of the meeting that the 6020(b) could be done because the returns had been solicited many times and we still don't have the returns or the payments. I thought it would not compromise the referral if the 6020(b) went thru. If you have a written summary of yesterdays events, could you please e-mail to both of us. Thanks." Hr'g Tr. Vol. II,

SAC and asked him a question about the effect on a criminal referral if the records or the taxpayer indicate that the taxpayer paid the tax after the examination began or that there was an entry on the records which indicate that the IRS had filed a return for the taxpayer. Id., at 22-24. The SAC could not answer the question. Id., at 24. He was not given any specific information about the case which had been discussed at the meeting. Consequently, Carene believed that, if Rutherford were to give the IRS any returns or payments, they should be accepted. Id., at 24-25. Carene testified that, during the course of her examination, she never took any direction from the SAC or anyone from the criminal division. Id., at 25.

During the first three months of 2004 Carene made attempts to continue the interviews of Rutherford and Bugaiski, which had been cut short when they met on December 16, 2003. Hr'g Tr. Vol. II, at 18, 28. She unsuccessfully tried to set up interviews through Gibbons. Id., at 29-30. She then caused a summons to be served on Rutherford and Bugaiski as members of DPR,[10] which had also become the subject of the IRS examination. Id., at 32.

Carene met with Rutherford and Bugaiski on June 17, 2004, pursuant to the summons. Bugaiski, as custodian of records, turned over documents at that meeting. Hr'g Tr. Vol. II, at 32. On June 21, 2004, Rutherford was interviewed by Tagami. Id., at 33. Agent Carene sat in on the interview and prepared a nine page single-spaced summary. Id., at 78. In preparation for the interview, Agent Tagami had prepared a list of 61 questions which he had asked Agent Carene to review in advance. Id., at 80. The topic of the interview was MES and the filings of their 990s

_____

at 20-21.

[10] DPR Management, formed in 1998, purchased the MED building for which it received rental payments. DPR had not filed tax returns. Gov't Ex. 6. DPR was a limited liability company, in which Rutherford had a controlling interest. Hr'g Tr. Vol. I, at 129-130.

(returns to be filed by tax exempt organizations).  Id., at 34-39.  Bugaiski was likewise

interviewed about MES on June 23, 2004.  Id., at 42.

Carene interviewed Rutherford again on June 25, 2004.  The topic of that interview was

DPR.  Hr'g Tr. Vol. II, at 43.  During the interview Rutherford was asked about questionable

deductions.  Carene "wanted to have the taxpayer explain to me exactly why these deductions or

why these checks were written from the partnership, and I would have no way of knowing that

unless I spoke to him and asked him."  Id., at 45-46.  Some of the expenses did not appear to

Carene to be logically consistent with the operation of a management company.  Id., at 46.

Carene testified,

> I had mentioned that he had paid $90,000, that DPR had paid $90,000 to Maestro
> Associates.  He, Mr. Rutherford, laughed at me and said, "Is that all that I paid?  I
> thought I paid him more than that."  And I said, "Well, what exactly did you pay
> him for?"  And I think he had paid him for, I think he said to scope out properties,
> and he said consulting work, government contracts, things like that, uzmn, but no,
> he had no work product.  He said, Mr. Rutherford said that he kept it all in his
> head.  That they just had verbal communication between the two of them, that
> there was no work product.
> . . . .
>
> [F]or every single deduction that I questioned I had asked for the work product,
> "What did the person do for the money" and things like that. And so that we
> didn't receive, I believe, any work product. But there was some contracts that Mr.
> Rutherford had signed, or DPR had signed for various individuals to do
> consulting work or whatever they did, but there was no work product ever
> provided.

Id., at 47-48.  Rutherford refused to answer some of the questions regarding deductions.  Id., at

45-48.  On June 29, 2004, Bugaiski was interviewed about DPR.  Id., at 48.

At no time did Agent Carene or Tagami ever inform Jon Rutherford or Judith Bugaiski

that there was a possibility of a criminal referral.  Hr'g Tr. Vol. II, at 120.  At no time did she

ever mention to them that there were indicators of fraud nor did she ever advise them of their

rights.  Id., at 120-21.  If a Special Agent of the CID interviews a taxpayer – or someone like Mr. Rutherford or Ms. Bugaiski – he or she is required to give an advice of rights; revenue officers and/or revenue agents are not so required.  Hr'g Tr. Vol. I, at 192-94.

On July 20, 2004, Frommer participated in a conference call with the agents and supervisors involved in the taxpayer examination.  Hr'g Tr. Vol. I, at 123.  A decision was made that a criminal referral should be made two weeks from then.  The additional time was needed for engineering work to be done.[11]

There were two referrals, one for DPR Management LLC (Gov't Ex. 7) and one for Jon Rutherford (Gov't Ex. 8), both with attachments that detailed the bases for the referrals.  The DPR referral was predicated on a number of factors including the failure to report a large amount of rental income, inappropriate distributions to other tax exempt entities, excessive rental payments to DPR from MES, and political contributions made by DPR.  Hr'g Tr. Vol. I, at 126-128.  During one of the interviews of Rutherford, he was asked why he formed DPR.[12]

---

[11] The engineering work dealt with an evaluation of the building sold from MES to DPR.

[12] "In late 1997 or early 1998, Rutherford formed DPR Management LLC (hereinafter "DPR"). The purpose of DPR was to manage property.  DPR did file Articles of Organization and does have an Operating Agreement. . . . .  Also in late 1998, MES (by Warranty Deed) transferred the 224 Highland property [the building used as a homeless shelter] to DPR for $1,000.  There is no evidence that any money was exchanged between MES and DPR.  There is no evidence in MES minutes that the Board members of MES voted on the transfer of the property.  There is no evidence that the Board members of MES voted on the amount of "rent" that would be paid from MES to DPR. 224 Highland is the only property that DPR is "managing."  There are no minutes or meetings for DPR.

DPR did not file any tax returns until contacted by IRS.  On December 19, 2003, DPR filed its returns for years 1997-2002. The ta.x returns for DPR indicate gross rents from MES as follows:
   Year 2000-$287,000
   Year 2001 -$405,000
   Year 2002-$690,474

Rutherford's response was that he did so for liability reasons and rent control. The latter response made no sense to Frommer, because Rutherford could charge whatever rent he wanted – he controlled both MES and DPR – and there was no rational basis that the transfer of ownership would provide liability protection. Id., at 129.

Prior to the referral, agents interviewed Ernest Johnson and Junious Williams, officers from Community Coalition, which had received $97,275 in 2001 and $91,400 in 2002 from DPR. "Both stated they feared reprisal as Rutherford is a very powerful man. . . . . Williams and Johnson stated that most of the money went for flyers and people to hand out flyers to get out the vote. Some of the money went for radio advertising that the Community Coalition had no say in." Gov't Ex. 7, Attachment pp. 2.

In the criminal referral, Rutherford's explanation about these types of donations was summarized:

> With regard to monies to Political Action Committees and other "charitable organizations," Rutherford stated he could spend his money anyway he wanted to. When Rutherford was reminded that the money was not his and that it was DPR's money, he stated he was the majority member and could do what he wanted to. When asked if MES could have made these kind of contributions, Rutherford stated no.

Gov't Ex. 7, Attachment pp. 3.

The attachment to the DPR referral listed the affirmative acts of fraud which were discovered during the IRS civil examination of the taxpayers. It stated:

> Jon Rutherford set up DPR for the following reasons:
> 1.     Rutherford was the President of MES (a non-profit organization). Rutherford could not make political, large charitable and payments to individuals from MES;

---

Gov't Ex. 7.

2.      Rutherford deeded the property located at 224 Highland, Highland Park, at less than fair market value. Warranty Deed indicates the property transferred for $1,000. DPR is depreciating the property at $400,000. Rutherford did not own the property. MES owned the property. He had no right to transfer that property of his own volition and without approval by MES Board members;

3.      No members contributed capital to DPR;

4.      Rutherford was the majority member of DPR. <u>No one questioned what he did</u>. Rutherford set the amount of the "rent" from MES to DPR which appears to be exorbitant and without approval by MES Board members;

5.      It is unknown why Rutherford made payments to individuals as there does not appear to be any legitimate business purpose for the payment of thousands of dollars to individuals without any known work product — most of whom did not receive 1099s;

6.      It is possible that Rutherford circumvented campaign laws by giving hundreds of thousands of dollars to various Political Action Committees and political organizations;

7.      Rutherford, in conjunction with Bernard Kilpatrick (father of Kwame Kilpatrick), and now members of Kwame Kilpatrick's staff Michael Tardif and Cassandra Smith-Gray, manipulated contribution and/or campaign funds by directing, at the very minimum, the Community Coalition members regarding how contributions from DPR would be spent;

8.      It is a fact that Bernard Kilpatrick formed Maestro & Associates in early 2002 (after his son was elected mayor). Maestro advertises on the internet as a political lobbying firm. It is also a fact that Rutherford "hired" Bernard Kilpatrick and paid him nearly $100,000 in 2002. No work product was ever provided. Further, Bernard Kilpatrick was appointed by his son to the Mental Health Board. This, of course, would be a large conflict of interest, as MES not only operated as a homeless shelter but also one of its dlb/a's manages the mentally ill. Rutherford vehemently denied paying Bernard Kilpatrick (Maestro) any monies once he was appointed to the Mental Health Board. The exact date of the appointment is unknown;

9.      DPR has paid Rutherford over $100,000 between 2000 and 2002. Substantiation has not been provided that would allow the amounts to be deducted. Rutherford did not pick up this money on his 1040 tax return as income;

10. DPR did not ever file a tax return until Rutherford
was contacted by IRS for his individual audit;
11. DPR does not have a separate office. There has been no
evidence provided regarding advertisement by DPR to
obtain any other business;
12. Rutherford stated he did not keep records tor DPR as he
"did not think DPR would ever be audited." In contrast,
Rutherford stated that MES keeps adequate records;
13. DPR did not pay expenses in the form of repairs, utility bills, taxes,
insurance, etc., on behalf of the property located at 224 Highland,
Highland Park, Michigan;
14. It is questionable whether DPR is a viable entity and
whether it possesses a legitimate business purpose. As
stated above, it is possible that campaign and/or other
election laws may have been broken due to the large
amounts of monies expended by DPR;
15. For the purpose of this referral, if DPR is deemed to be a viable
entity, adjustments are made to disallow the deductions for each
year as well some charitable contributions and bad debts.

Gov't Ex. 7, Attachment pp. 6-7.

The referral identifies several of the questionable payments made by DPR. Gov't Ex. 7,

Attachment, pp. 2. The cancelled checks used to reconstruct the DPR expenses were not

obtained by Carene until February or later. Hr'g Tr. Vol. II, at 49. Consequently, she could not

question Rutherford about them until the June 2004 interview. Affirmative Act #5 dealt with

questionable deductions, and Affirmative Act #8 focused specifically on money paid to Bernard

Kilpatrick. Carene elaborated on the significance of these:

A. Number 5 deals with the, again the questionable deductions that were made
from the DPR account to various individuals.

Q. Was that significant to you?

A. Yes, and I really didn't have the answer to that until I talked to him. I didn't
know without speaking to the taxpayer why any of these deductions or why the
checks were written.

Q. Would you go paragraph number 8, please. And you mentioned this earlier dealing with Maestro Associates and the lack of work product. Was that significant to you?

A. It was, because, you know, the case originated from a newspaper article that had to do with a contract that was awarded to MES and supposedly the Mayor had something to do with writing a recommendation in exchange, you know, the article said that money had been exchanged. And whether that had anything to do with what I was doing or not, I really didn't know. Because my job was to interview, you know, to interview him regarding his 1040 and his 1065 involvement. But the 1065 paid money to the Mayor's father, without any work product, from a company that, from a partnership that all it had was one property that was deeded by the non-profit for really no consideration. It didn't make any sense that any of these deductions should be allowed or should have been made.

Hr'g Tr. Vol. II, at 50-51.

In the Rutherford referral there is a reference to a significant discrepancy between his bank deposits and declared income. Gov't Ex. 8, Attachment para. 2. As pointed out in the attachment at paragraph 2, for the 2001 tax year money deposited into Rutherford's bank account exceeded $600,000. Asked about this, Rutherford asserted that $430,000 of that amount was repayment of a loan. Following up on this, Carene asked for, and received, the purported promissory note. Hr'g Tr. Vol. II, at 52. As stated by Frommer as the reason for making the referral in July 2004:

I believe we had enough, or we had affirmative acts that showed intent and willfulness by the taxpayer to fail to collect and turn over the employment taxes, not report substantial amounts of income, not file tax returns for DPR Management.

Hr'g Tr. Vol. I, at 124.

## III.  CONCLUSIONS OF LAW

As the Government states, the civil examination, begun in May 2003, could have led in several different directions, exculpatory or inculpatory. The question for the Court to determine

is if there is a factual basis to conclude that the civil examination was used as an investigative tool for the criminal investigators. The answer to this question is predicated on the determination of when in the investigation there were firm indications of fraud. The question of when a firm indication of fraud is present is not an easy one. It must be determined on a case by case basis from the totality of the facts. U.S. v Peters, 153 F.3d 445, 453 (7th Cir. 1998). The rule "cannot be expressed in a set of absolute criteria and . . . the facts and circumstances of each case must be assessed in their own light." Id.

In United States v McKee, the Sixth Circuit discussed the IRS Manual's prohibition against developing a criminal case against a taxpayer under the guise of a civil investigation. U.S. v McKee, 192 F.3d 535 (6th Cir. 1999). "If the revenue agent continues the civil audit even after she has developed 'firm indications of fraud,' then she is, in fact, making affirmative misrepresentations to the constitutional detriment of the taxpayer because she is gathering criminal evidence against the taxpayer under the guise of a civil proceeding." Id., at 542 n5. However, the agent and his supervisor should enjoy great latitude and deference.

> Federal judges, after all, are not revenue agents. The administration of the revenue laws is a function which by congressional direction and by expertise belongs to IRS. Liberty Financial Services v. U.S., 778 F.2d 1390, 1392 (9th Cir. 1985); U.S. v. G & G Advertising Co., 762 F.2d 632, 635 (8th Cir. 1985). Determining the presence of tax fraud can be an intricate process. "Second-guessing a Revenue Agent's judgment should not become a routine chore for judges . . . ." United States v. Matis, 476 F.Supp. 1287, 1292-93 (S.D.N.Y.1979).

Groder v. U.S., 816 F.2d 139, 143 (4th Cir. 1987).

Generally, when there are first indicators of fraud the taxpayer is given the opportunity to explain.

The case law recognizes that an assessment of the taxpayer's intent is the most critical element in a revenue agent's determination of whether "firm indications of fraud" exist in any particular case.  See Caldwell, 820 F.2d at 1402-03; United States v. Groder, 816 F.2d 139, 143-44 (4th Cir. 1987); Piper, 681 F.Supp. at 838. Indeed, it is the taxpayer's intent to evade taxes that differentiates a criminal violation from a civil case.  For this reason, a revenue agent who discovers potential violations of the revenue laws will almost always give the taxpayer an opportunity to explain the violations before determining the appropriateness of a criminal referral.

U.S. v. Peters, 153 F.3d at 455.

With these principles in mind, the Court finds that there were firm indicators of fraud following the investigation which occurred after the initial interview with the taxpayers in January and before summoning them to appear in June, 2004.  At that time, there were significant circumstances which, considered in their totality, support this conclusion:

1.   In June 2003, Agent Tagami knew that MES had not filed *many* 941 forms over a *nine* year period from 1994.  Rutherford admitted this, but his explanation was that the funds were late in coming into the business.

2.   Revenue Officer Mahaffey in a written memo in July, 2003, stated that the case was filled with "very large and significant indicators of fraud" which needed development and/or explanation.

3.   Fraud Referral Specialist Frommer noted on August 7, 2003 that defendants' tax returns included taxes withheld, even though employment taxes were not remitted to IRS, and concluded in a written memo that there were some first indications of fraud.

4.   On October 16, 2003 Agent Suzanne Carene discussed at a meeting the importance of interviewing the taxpayers to enable them to explain the indicators of fraud that had been detected by the IRS.  She, however, was told on December 3, 2003, by Gibbons, the taxpayers' representative, that Rutherford did not want to meet with the IRS.

5.   Rutherford and Bugaiski were finally interviewed for the first time by Carene  on December 16, 2003. At that interview, Rutherford became agitated at the questioning and pounded his fist on the table stating he wanted to leave.  After being told by Carene that she was not finished and needed more information, Rutherford chose to leave the room.

6.   In January, 2004, there was a lengthy meeting with Frommer, Burns, district counsel Nicholaides, Tagami, Allen, Carene, Group Manager Gusse, and a

territory manager,[13] in which there was a discussion about referring the matter at that time. It was thought it was too early because more information could be gathered. Frommer also decided not to split the referrals to the CID.

7.    The investigation continued through the first half of 2004, during which time Carene unsuccessfully tried to set up another interview with defendants through Gibbons. After they refused to meet with her, she issued an IRS summons requiring them to come in for interviews on June 17, 2004.

When the taxpayers refused to come in for an interview in June, this investigation should have been halted. Agent Carene testified that the purpose of the taxpayer interview is to give the taxpayer an opportunity to explain any discrepancies or issues. Mr. Rutherford and Ms. Bugaiski had that opportunity in their first interview. However, they chose to truncate their explanations and Mr. Rutherford stomped out. Neither would voluntarily appear for a second interview.

The quest in this civil examination was to find firm indicators of fraud - not to establish beyond a reasonable doubt that the defendants were engaged in fraud. Without an alternate explanation for defendants' actions, the "first" indicators of fraud morphed into "firm" indicators. And once the investigation has become so focused on the criminality of the defendants, it would be constitutionally infirm to force their cooperation.

## IV.   CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that the parties call the case manager and set up a status conference to discuss the next step in these proceedings.

---

[13]This was an unusually large number of IRS personnel to be involved in an investigation.

**IT IS SO ORDERED.**


s/Marianne O. Battani    
Marianne O. Battani
UNITED STATES DISTRICT JUDGE

DATED: June 12, 2007


### CERTIFICATE OF SERVICE
Copies of this Order were served upon Robert Cares, Steven Fishman, and Robert Morgan on this date electronically.

s/Bernadette M. Thebolt
Case Manager